Of Counsel:
DAVIS LEVIN LIVINGSTON

MARK S. DAVIS            1442-0
MICHAEL K. LIVINGSTON   4161-0
LORETTA A. SHEEHAN      4160-0
851 Fort Street, Suite 400
Honolulu, Hawaii  96813
Telephone: (808) 524-7500
Fax: (808) 356-0418
Email: lsheehan@davislevin.com
        mlivingston@davislevin.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **DONALD W. BOND,** Individually, and as Personal Representative of **THE ESTATE OF JULIE M. BOND**, and as Next Friend of his minor children, **I.H.B., E.G.B., and E.J.B.,** and **BETH ANDERSON**, Individually,<br><br>PLAINTIFFS,<br><br>vs.<br><br>**UNITED STATES OF AMERICA**,<br><br>DEFENDANT. | CIVIL NO.<br>(FEDERAL TORT CLAIMS ACT)<br><br>**COMPLAINT; SUMMONS TO ANSWER CIVIL COMPLAINT** |

## COMPLAINT

COME NOW Plaintiffs above named, by and through their attorneys, DAVIS LEVIN LIVINGSTON, and for a cause of action against the United States of America, allege and aver as follows:

## INTRODUCTION

1.     This Complaint is filed pursuant to the provisions of the Federal Tort Claims Act, Title 28, United States Code §§ 1346(b), 2671, *et seq*., against the United States of America ("Defendant") for catastrophic physical and emotional injuries which ultimately resulted in the wrongful death of 31-year-old Julie M. Bond, and for the devastating emotional injuries suffered by her loved ones, to include her husband Staff Sergeant Donald W. Bond, minor children I.H.B, E.G.B, and E.J.B., and mother Beth Anderson.

## JURISDICTION AND VENUE

2.     The physicians, nurses and staff who breached the applicable standards of care, as hereinafter alleged, were at all relevant times acting within the course and scope of their employment with Defendant United States of America.

3.     This court has jurisdiction with respect to this lawsuit under the Federal Tort Claims Act, 28 USC §§ 1346(b), 2671, *et seq*.

4.     Plaintiffs were citizens of the State of Hawaii at the time of the Defendant's negligence, but currently reside within the State of Georgia. The injuries suffered by the Plaintiffs occurred in the City and County of Honolulu, State of Hawaii. Venue is proper in the Federal District Court for the District of Hawaii.

5.     Pursuant to the provisions of the Federal Tort Claims Act, 28 USC §§ 2871, *et seq*., Plaintiffs filed administrative claims on September 9, 2021 for personal

injury against the United States of America within the statutory period as required by law. The United States of America acknowledged receipt of the Federal Tort Claims Act claims forms on September 13, 2021.

6. More than six months have elapsed since the filing of Plaintiffs' administrative claim forms. As of the date of the filing of this Complaint, Defendant United States has not taken final administrative action on the Plaintiffs' claims and, therefore, Plaintiffs have duly exhausted all administrative procedures and the Complaint is timely filed.

## **PARTIES**

7. Plaintiff Donald W. Bond, husband of Julie M. Bond, and father of minor Plaintiffs I.H.B, E.G.B, and E.J.B., is an individual who resided within the State of Hawaii at the time of the negligence of Defendant. Plaintiff Donald W. Bond brings this suit in his individual capacity and as Personal Representative of THE ESTATE OF JULIE M. BOND, and as Next Friend to his minor children, I.H.B., E.G.B., and E.J.B.

8. Plaintiff I.H.B. is the minor son of Plaintiffs Donald W. Bond and Julie M. Bond. Plaintiff I.H.B. resided within the State of Hawaii at the time of the negligence of Defendant.

9. Plaintiff E.G.B. is the minor daughter of Plaintiffs Donald W. Bond and Julie M. Bond. Plaintiff E.G.B. resided within the State of Hawaii at the time of the

negligence of Defendant.

10.     Plaintiff E.J.B. is the minor son of Plaintiffs Donald W. Bond and Julie M. Bond.  Plaintiff E.J.B. resided within the State of Hawaii at the time of the negligence of Defendant.

11.     Plaintiff Beth Anderson, mother of Julie M. Bond, is an individual who resided within the State of Hawaii at the time of the negligence of Defendant. Plaintiff Beth Anderson brings this suit in her individual capacity.

## FACTUAL ALLEGATIONS

12.     The Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 11, above, as is fully set forth herein.

13.     In April of 2020, the United States Army moved Staff Sergeant Donald W. Bond, his wife, Julie M. Bond, and their three children to Honolulu, Hawaii.

14.     In April of 2020, Beth Anderson moved to Honolulu, Hawaii.

15.     As of April, 2020, Mrs. Bond worked inside the home as a homemaker and mother to the three Bond children, ages 4, 3 and 2 months.

16.     Mrs. Bond's youngest child, E.J.B. was born February, 2020.  E.J.B. was 9 pounds, 4 oz. at birth.  Mrs. Bond had gained approximately 40 pounds during her pregnancy with E.J.B.

17.     On June 16, 2020, only 4 month after the delivery of E.J.B., and while she was still breastfeeding, Mrs. Bond saw Dr. Angel J. Yap at the Schofield Barracks Clinic to inquire about bariatric surgery.

18.     On June 16, 2020, Mrs. Bond was 66 inches, 257 pounds, with a BMI of 41.28.

19.     On June 16, 2020, Dr. Yap referred Mrs. Bond to the General Surgery Outpatient Clinic for a Consultation for Bariatric Surgery.

20.     On July 9, 2020, laboratory testing revealed Mrs. Bond to have borderline hyperlipidemia (fats in the bloodstream).

21.     Mrs. Bond had not been prescribed any medication to control her cholesterol or triglycerides.

22.     On July 10, 2020, Mrs. Bond attended a group session (9 people) Bariatric Information Session, conducted by Dr. Chan Woo Park of Tripler Army Medical Center (TAMC).

23.     At that meeting, Mrs. Bond was informed of the eligibility requirements of the TAMC Bariatric Surgery Program.

24.     Under the TAMC Bariatric Surgery Pathway, one could qualify for bariatric surgery if: (a) the patient had a Body Mass Index (BMI), equal to or greater than 40 or (b) a BMI between 35 and 40 with at least one qualifying co-morbidity, i.e. high blood pressure, diabetes, high cholesterol, severe arthritis, sleep apnea,

GERD, some liver/kidney disease, or several others based on consult from a Primary Care Physician.

25.     In the event that a person has a BMI of between 35 and 40, if the co-morbidity was high blood pressure or high cholesterol, the patient must have been prescribed relevant medication prior to acceptance into the TAMC Bariatric Surgery Program.

26.     As of July 10, 2020, Mrs. Bond had not been prescribed any medication to reduce her blood pressure or cholesterol.

27.     On July 10, 2020, Mrs. Bond weighed 248.6, a drop of approximately 9 pounds since her visit with Dr. Yap 3 weeks earlier.

28.     On July 10, 2020, Mrs. Bond's BMI measured 40.12.

29.     On July 10, 2020, Dr. Park charted that Mrs. Bond was obese with "associated medical comorbidities as noted above."  Mrs. Bond did not have "associated medical comorbidities" which would qualify as co-morbidities under the TAMC Bariatric Surgery Program.

30.     On July 10, 2020, Dr. Park claimed that a "thorough review" of the "patient's medical, surgical, family, and psycho-social history" had been conducted, and that, based upon the "thorough review," Mrs. Bond would be "initiated" into the Bariatric Surgery Pre-Op protocol.

31.     On July 21, 2020, Mrs. Bond attended her first Bariatric Surgery consult appointment with Dr. Christopher Yheulon.  At her first Bariatric Surgery consult, Mrs. Bond weighed 240.4 pounds, having lost approximately 8 pounds in the prior 11 days.  Her Body Mass Index (BMI) was 38.8.

32.     According to the TAMC "Bariatric Surgery Pathway," to be eligible for bariatric surgery, with a BMI between 35 and 40, Mrs. Bond was required to have a "qualifying co-morbidity."

33.     As of July 21, 2020, with a BMI of 38.8, Mrs. Bond did not have a "qualifying co-morbidity."

34.     On July 21, 2020, Dr. Yheulon decided that Mrs. Bond was an "excellent" bariatric surgery candidate, despite Mrs. Bond's history of depression, her post-partum depression, an active "anxiety disorder (unspecified)," use of anti-depressants and anti-anxiety medications, and her status as a post-partum and lactating mother who was losing large amounts of weight very quickly.

35.     On July 29, 2020, Mrs. Bond underwent a pre-operative clearance for surgery.  Her stated weight was 234 pounds, reflecting a loss of approximately 6 pounds in the prior 8 days.

36.     On July 29, 2020, Dr. Andrew Howard performed a cardiac consultation, and incorrectly charted that Mrs. Bond's BMI was 41 at the time.

37.     On July 29, 2020, Dr. Howard also incorrectly charted that Mrs. Bond had experienced "no recent weight loss/weight gain."

38.     On July 29, 2020, Dr. Howard cleared Mrs. Bond for surgery, but warned that "[p]atient has an increased risk of post-operative pulmonary complications," and advised that "[p]ulmonary risk reducing strategies include keeping surgery time limited to < 3 hours and avoidance of long-acting neuromuscular blockade."

39.     On July 29, 2020, Dr. Howard also determined that Mrs. Bond was at "moderate" risk for deep vein thrombosis.

40.     On August 5, 2020, Mrs. Bond had a telephone session with the Nutrition Clinic at TAMC.  Her stated weight was 229.4 pounds, representing a loss of 4.6 pounds in the prior 7 days.  Her BMI was calculated to be 37.02.  Ms. Rochelle Eiger, Registered Dietician, noted that Mrs. Bond's weight loss, while impressive, was "post partum and while breastfeeding."

41.     On August 5, 2020, Ms. Eiger cleared Mrs. Bond for bariatric surgery.

42.     On October 27, 2020, Dr. Yheulon cleared Mrs. Bond for bariatric surgery.  Mrs. Bond weighed 217.2 pounds, with a BMI of 35.06, a loss of approximately 31 pounds since her initial visit with Dr. Yap at the Schofield Clinic.

43.     On October 27, 2020, Mrs. Bond had no co-morbidities and did not meet TAMC guidelines for bariatric surgery.

44. On October 27, 2020, Dr. Yheulon informed Mrs. Bond of the risks and benefits of Roux en Y surgery. Dr. Yheulon informed Mrs. Bond that her risks of the Roux en Y surgery included a 1% chance of leaks, bleeding, pain, infection, scar, damage to surrounding structures (potentially bowel, stomach and esophagus), dumping syndrome, a 3%-5% chance of marginal ulcer, a less than 3% chance of stricture, a 5%-10% lifetime risk of internal hernia, a 3%-5% risk of failure to lose weight, the need for a possible sleeve gastrectomy if gastric bypass is not anatomically possible. Upon information and belief, these numbers were inaccurate for the Bariatric Surgery Program at TAMC, and in particular, for the surgery that Dr. Yheulon and Resident Dr. Jillian Findlay actually ended up performing.

45. On October 27, 2020, Dr. Yheulon did not advise Mrs. Bond that the consensus of the medical community was that the risks of bariatric surgery outweigh the benefits if it is performed on a patient whose BMI falls below 40 and who has no comorbidities.

46. On October 27, 2020, Dr. Yheulon did not advise nor recommend to Mrs. Bond that she postpone or cancel the proposed Roux en Y surgery in light of her nonsurgical weight loss and drop in BMI, in that the risks of the surgery now outweighed potential benefits.

47. On October 27, 2020, Dr. Yheulon scheduled Mrs. Bond's surgery for November 5, 2020.

48.    On November 5, 2020, Mrs. Bond weighed 206 pounds, with a BMI of 33.20, a loss of approximately 42 pounds since her initial visit with Dr. Yap at the Schofield Clinic.

49.    On November 5, 2020, Mrs. Bond had no comorbidities and did not meet TAMC guidelines for bariatric surgery.

50.    On November 5, 2020, Dr. Yheulon and Dr. Findlay performed an ante-gastric, ante-colic Roux en Y surgery on Mrs. Bond.

51.    The Roux en Y procedure is a surgery which alters the gastrointestinal tract by decreasing the size of the stomach and shortening the small intestine.  The Roux en Y is designed to limit food intake and cause malabsorption of calories and nutrition.

52.    During surgery, Dr. Yheulon and Dr. Findlay divided Mrs. Bond's stomach into two vessels, and stapled each vessel shut.  By doing so, they created two "stomachs," a small gastric pouch and a remnant stomach pouch.

53.    The post-surgical purpose of the small gastric pouch was to receive restricted amounts of food and drink.

54.    The post-surgical purpose of the remnant stomach was to continue to create and contribute gastric secretions, about 1.2-1.5 liters every day.

55.     During surgery, Dr. Yheulon and Dr. Findlay cut Mrs. Bond's small intestine into two segments and pulled the distal end of her newly-severed small intestine up to her newly-created gastric pouch.

56.     During surgery, Dr. Yheulon and Dr. Findlay stapled the distal end of the small intestine to the newly-created gastric pouch, creating a "Roux limb."

57.     The post-surgical purpose of the Roux limb was to transport food and drink through Mrs. Bond's shortened gastrointestinal tract.

58.     During surgery, Dr. Yheulon and Dr. Findlay attached the proximal end of Mrs. Bond's newly-severed small intestine—the piece still attached to the remnant stomach—to Mrs. Bond's small intestine, creating a "biliopancreatic" limb.

59.     The post-surgical purpose of the biliopancreatic limb was to contribute gastric (from stomach), pancreatic (from pancreas) and biliary (from gall bladder) secretions to the small intestine.

60.     During surgery, Dr. Yheulon and Dr. Findlay connected the Roux limb and the biliopancreatic limb via a jejuno-jejunal anastomosis (JJ anastomosis).

61.     The following is a diagram of human gastrointestinal tract after an ante-gastric, ante-colic Roux en Y surgery is performed correctly:



62. A gastric pouch appears at approximately 12:00 o'clock and is labeled "GP:"

63. The remnant stomach appears at approximately 1:00-4:00 o'clock and is labeled "S."

64. The Roux limb appears at approximately 12:00 o'clock to 6:00 o'clock and is labeled "R."

65.    The biliopancreatic limb appears at approximately 7:00 o'clock to 9:00 o'clock and is labeled "BPL."

66.    The JJ anastomosis, i.e. where the Roux limb and biliopancreatic limb attach, appears at approximately 6:00 o'clock in this diagram, and is labeled with an arrow pointing to a series of staples and/or sutures.

67.    The Common Channel, i.e. where nutrition, gastric, bilious and pancreatic secretions continue downstream after the JJ anastomosis appears at approximately 6:00 o'clock in this diagram, and is labeled "CC."

68.    During surgery, Dr. Yheulon and Dr. Findlay improperly reversed the position of the Roux limb when stapling the JJ anastomosis.

69.    On November 5, 2020, the JJ anastomosis, improperly stapled in a retrograde fashion, caused the Roux limb and biliopancreatic limb to form a loop, which then caused a closed loop obstruction.

70.    On November 5, 2020, Dr. Yheulon and Dr. Findlay knew, before surgery ended, that the JJ anastomosis had been stapled backwards, and that they had the opportunity to correct their surgical error.

71.    On November 5, 2020, Dr. Yheulon and Dr. Findlay decided not to correct the JJ anastomosis, despite knowing that it had been improperly stapled in a retrograde fashion.

72. On November 5, 2020, Dr. Yheulon and Dr. Findlay knew or should have known that there was a high risk that the loops of Roux limb and biliopancreatic limb caused by the retrograde stapling would become completely obstructed and prevent the passage of food and drink (foreign fluids) as well as gastric, pancreatic and biliary secretions downstream.

73. On November 5, 2020, Dr. Yheulon and Dr. Findlay knew or should have known that back-pressure would build within the obstructed loops of small intestine and that the loops would become distended as Mrs. Bond attempted to eat and drink (foreign fluids) and as Mrs. Bond's gastrointestinal tract continued to create gastric, pancreatic and biliary secretions without a way to clear fluids from the gastrointestinal tract.

74. On November 5, 2020, Dr. Yheulon and Dr. Findlay knew or should have known that stapling the JJ anastomosis backwards that created a closed loop obstruction would require surgical repair within a very short period of time.

75. On November 5, 2020, Dr. Yheulon and Dr. Findlay knew or should have known that a second surgery within days would greatly increase Mrs. Bond's risk of complications.

76. On November 5, 2020, Dr. Yheulon and Dr. Findlay did not inform Staff Sgt. Bond that they had stapled the JJ anastomosis backwards.

77.     Dr. Yheulon and Dr. Findlay did not discuss the risks and benefits of their treatment decision, made during the November 5, 2020 surgery, to decline to correct the backwards-stapled JJ anastomosis with Mrs. Bond's representative, Staff Sgt. Bond.

78.     On November 5, 2020, Molly Stalons, "Suzie," a representative of Covidien, the vendor that had provided the stapler used to form Mrs. Bond's JJ anastomosis, was present in the Operating Room during Mrs. Bond's surgery.

79.     Upon information and belief, Dr. Yheulon and Dr. Findlay were training on the Covidien stapler during Mrs. Bond's November 5, 2020 surgery.

80.     On November 5, 2020, Mrs. Bond arrived in the Post Anesthesia Care Unit ("PACU") at 11:30 am.

81.     On November 6, 2020, just before discharge at 4:00 pm, Mrs. Bond reported her pain as 7/10.

82.     As pressure inside the closed loop obstruction of the Roux limb and biliopancreatic limb increased, Mrs. Bond's looped Roux limb and biliopancreatic limb pushed through her mesentery (i.e. the continuous set of tissues that holds the holding the intestines in place), and formed an internal hernia in a space called the Petersen's defect.

83.     At approximately 7:00 pm on November 7, 2020, the day after discharge, Mrs. Bond's upper abdominal pain climbed to overwhelming levels.

84.     On November 8, 2020, at 8:55 am, Mrs. Bond presented to the TAMC Emergency Department.

85.     On November 8, 2020, Mrs. Bond reported that since her discharge from TAMC on November 6, 2020, she had experienced nausea, vomiting and urinary problems, and that, beginning at 7:00 pm on November 7, 2020, she began to suffer with "sharp" pain in her abdomen.

86.     On November 8, 2020, Mrs. Bond underwent a Computerized Tomography ("CT") of her Abdomen and Pelvis with Oral Contrast, which revealed a closed loop obstruction with marked dilatation of her small intestine, and swirling mesenteric vessels.

87.     Marked dilatation of the small intestine and swirling mesenteric vessels were due to the closed loop obstruction in Mrs. Bond's small intestine positioned behind the Roux limb and mesentery, a consequence of a JJ anastomosis stapled backwards.

88.     On November 8, 2020, the pre-operative CT of Mrs. Bond's Chest, Abdomen and Pelvis with Oral Contrast and Chest x-ray revealed that she did ***not*** have pre-operative blood clots in her lungs (pulmonary emboli).

89.     On November 8, 2020, Dr. Yheulon diagnosed the need for emergency surgery to reduce the closed loop obstruction and scheduled emergency surgery.

90.    On November 8, 2020, Dr. Yheulon conducted emergency surgery on Mrs. Bond at TAMC.

91.    On November 8, 2020, TAMC negligently assigned Certified Registered Nurse Anesthetist ("CRNA") Kari Rodden to provide anesthesia services in Mrs. Bond's emergency surgery, rather than an Anesthesiologist.

92.    CRNA Rodden incorrectly rated Mrs. Bond's surgery as "2E" under the American Society of Anesthesiologists ("ASA") Physical Status Classification System.

93.    An ASA II patient is one with "mild systemic disease," "without substantive functional limitations," thus excluding Mrs. Bond.

94.    On November 8, 2020, Mrs. Bond was at risk for aspiration, given her obesity, high intra-abdominal pressure, closed loop obstruction, post-surgical incompetent lower esophageal sphincter, and reduced stomach size.

95.    On November 8, 2020, CRNA Rodden negligently failed to decompress Mrs. Bond's stomach for gastric secretions and foreign fluids before surgery.

96.    On November 8, 2020, CRNA Rodden and/or Dr. Yhuelon negligently failed to take precautions to avoid aspiration of gastric secretions and foreign fluids should Mrs. Bond vomit during surgery, to include placement of a nasogastric tube ("NG tube").

97.     On November 8, 2020, on induction of anesthesia, Mrs. Bond immediately vomited and aspirated caustic gastric secretions and foreign fluids.

98.     On November 8, 2020, CRNA Rodden negligently failed to arrange for an immediate bronchoscopy to suction and/or lavage the caustic gastric secretions and foreign fluids that had entered Mrs. Bond's lungs to ensure that they would not travel down into the lungs, burn the alveoli, and cause pneumonia and sepsis.

99.     On November 8, 2020, *after* the caustic gastric secretions and foreign fluids had entered Mrs. Bond's lungs, CRNA Rodden placed an NG tube.

100.    Mrs. Bond's aspiration of caustic gastric and bilious secretions and foreign fluids on November 8, 2020 caused Mrs. Bond to develop Acute Respiratory Distress Syndrome ("ARDS"), pneumonia and sepsis.

101.    Mrs. Bond's aspiration of caustic gastric secretions and foreign fluids on November 8, 2020 also damaged the alveoli in her lungs, thus impairing her ability to receive oxygen.

102.    On November 8, 2020, emergency surgery confirmed that the JJ anastomosis had rotated up and through the mesentery, forming an internal hernia and a closed loop obstruction, which cut off blood supply to a portion of Mrs. Bond's small intestine.

103.    On November 8, 2020, emergency surgery also revealed leaks at the gastrojejunostory anastomosis ("GJ anastomosis"), i.e. at the attachment of the small

intestine to the gastric pouch that had been created on November 5, 2020, and at the JJ anastomosis.

104. The leaks at the GJ anastomosis and JJ anastomosis had been caused by the growing pressure created by the on-going production of gastric, bilious and pancreatic secretions trapped in the biliopancreatic limb.

105. The migration of bacteria outside her GJ anastomosis and JJ anastomosis contributed to the development of infection, sepsis, and the inflammatory cascade known as Systemic Inflammatory Response Syndrome ("SIRS").

106. On November 8, 2020, Dr. Yheulon surgically reversed the JJ anastomosis and repaired the leaks.

107. Mrs. Bond's November 8, 2020 corrective surgery lasted for approximately seven hours, well over Dr. Howard's pre-surgical pulmonary risk reducing strategies of keeping surgery time limited to < 3 hours and avoiding long-acting neuromuscular blockade.

108. On November 8, 2020, post-surgery, Mrs. Bond was admitted to the Intensive Care Unit ("ICU") with a diagnosis of sepsis.

109. On November 8, 2020, upon admission to the ICU, Mrs. Bond remained on a ventilator.

110. At 4:33 pm on November 9, 2020, a CT Angiogram was conducted, revealing the presence of bilateral pulmonary emboli, i.e. blood clots in Mrs. Bond's

lungs.

111.   TAMC physicians recommended IV administration of tissue-type plasminogen activator ("tPA") over 2 hours, followed by a heparin drip.

112.   At 8:00 pm on November 9, 2020, TAMC health care providers administered systemic tPA to Mrs. Bond in order to dissolve the blood clots found in Mrs. Bond's lungs.

113.   A safer, gentler approach would have been to provide systemic low dose heparin to dissolve the clots slowly and/or to provide low dose tPA via catheter placed directly at the site of the clot by an Interventional Radiologist.

114.   The TAMC Interventional Radiology Department was, however, closed, and Mrs. Bond was not transferred to the Queen's Medical Center ("QMC") to provide her with the less risky options of providing low dose heparin and/or catheter-directed low dose tPA.

115.   The administration of tPA to Mrs. Bond caused microhemorrhages in her brain, causing irreversible brain damage.

116.   Starting at 11:00 pm on November 9, 2020, after administration of the tPA, Mrs. Bond's temperatures trended upward, to 102.3 F, 101.5 F, 102.2 F, and 104.0 F.  Ice sheets were applied, and Mrs. Bond's internal core temperature measured 107.5 F.  Extreme temperature and an inability to control one's body temperature indicates brain dysfunction.

117.    At 4:45 am on November 10, 2020, Mrs. Bond experienced seizures, with extensor posturing.  She became extremely agitated, tachycardic and hypertensive, and new anisocoria was noted in her eyes.  Seizures are signs of brain injury.

118.    On November 10, 2020, TAMC transferred Mrs. Bond to QMC for treatment via Extracorporeal Membrane Oxygenation ("ECMO"), a procedure which removes blood from the body, runs the blood through an oxygenator, then pumps oxygenated blood back into the body, allowing the lungs to rest.

119.    On November 11, 2020, QMC determined that Mrs. Bond was not a candidate for ECMO.

120.    On November 11, 2020, QMC commenced Continuous Renal Replacement Therapy ("CRRT"), a type of dialysis to filter the blood running through Mrs. Bond's kidneys.

121.    On November 12, 2020, a family meeting was held with QMC staff, Staff Sgt. Bond and Mrs. Bond's mother, Ms. Anderson.  At that meeting, Staff Sgt. Bond and Ms. Anderson were informed of Mrs. Bond's hypoxic brain injury and were advised that Mrs. Bond would not recover.

122.    On November 12, 2020, Staff Sgt. Bond and Ms. Anderson made the gut-wrenching decision to change Mrs. Bond's status from "full code," to "Do Not Resuscitate."

123. On November 17, 2020, Mrs. Bond underwent an electroencephalogram ("EEG"), a test that detects electrical activity in the brain. Her EEG was abnormal, suggestive of severe diffuse disturbance of cerebral function, i.e. severe widespread brain damage.

124. By November 20, 2020, Mrs. Bond had developed an injury to her skin and underlying tissue resulting from prolonged pressure on the skin, i.e. a decubitus ulcer.

125. On November 21, 2020, Mrs. Bond was noted to be in a coma, and unresponsive.

126. On November 22, 2020, Mrs. Bond still could not move, but a "weak" cough and "weak" gag reflex was noted.

127. On November 22, 20220, Mrs. Bond underwent a Magnetic Resonance Imaging ("MRI") of her brain and a CT Angiogram ("CTA") of her lungs.

128. Mrs. Bond's MRI revealed acute and subacute areas of tissue death ("infarctions") in her brain, and numerous additional tiny blood clots throughout her cerebellum, brainstem and cerebrum.

129. Mrs. Bond's CTA revealed extensive bilateral groundglass lung consolidations, mostly within the lower lobes, suggesting pneumonia, and scattered bilateral emboli throughout both lungs.

130. On November 23, 2020, Mrs. Bond underwent a second EEG. The findings were consistent with a comatose state.

131. On November 23, 2020, Mrs. Bond opened her eyes. The remainder of her body was immobile.

132. On November 25, 2020, Mrs. Bond remained a functional quadriplegic, but QMC nurses charted that Mrs. Bond was able to blink in response to questions. She blinked when asked whether she was in pain.

133. On November 25, 2020, Staff Sgt. Bond and Beth Anderson changed Mrs. Bond's status from "Do Not Resuscitate" to "Full Code."

134. On December 8, 2020, QMC discharged Mrs. Bond back to TAMC.

135. On December 8, 2020, TAMC admitted Mrs. Bond for the third time.

136. On December 8, 2020, Mrs. Bond remained unable to move below her neck.

137. On December 8, 2020, dead tissue ("necrosis") was noted on Mrs. Bond's fingers, toes, forearms and left heel.

138. On December 8, 2020, Mrs. Bond's sensation remained "grossly intact."

139. On December 8, 2020, Mrs. Bond was breathing through a ventilator, receiving nutrition through a tube, receiving fluids through IVs, urinating and defecating through tubes.

140.    On December 9, 2020, Mrs. Bond lay in her hospital bed, crying. TAMC nurses documented that she seemed anxious and uncomfortable.  She could communicate with nurses by blinking and shaking her head "no" slightly.

141.    On December 9, 2020, Mrs. Bond underwent an MRI.

142.    Mrs. Bond's MRI revealed findings consistent with a global anoxic brain injury.  The TAMC radiologist concluded that "[d]ifferential considerations for cause of parenchymal microhemorrhages include tPA therapy in the setting of pulmonary embolus versus less likely septic emboli."

143.    On December 10, 2020, Mrs. Bond developed a fever and a rise in her white blood cell count was noted, indicating infection.

144.    Cultures were taken of Mrs. Bond's peritoneal drains (drains in her abdomen), resulting in positive cultures for pseudomonas, a bacteria.

145.    On December 13, 2020, TAMC nurses charted that Mrs. Bond was able to mouth words and communicate with staff via non-verbal means.

146.    On December 13, 2020, Mrs. Bond's four extremities remained flaccid without movement.

147.    On December 13, 2020, TAMC nurses charted Mrs. Bond's "uncontrollable pain."

148.   On December 15, 2020, Mrs. Bond was taken back to the Operating Room to change her persistently clogged abdominal wound vacuum with resultant severe pain.

149.   On December 15, 2020, after the wound vacuum change, Mrs. Bond experienced a severe change in her hemodynamic status. Her post-operative blood pressures dropped "to a dangerous level," and she went into a state of shock.

150.   On December 16, 2020, Staff Sgt. Bond and Ms. Anderson made the heart-breaking decision to discontinue all vasopressors, and to turn off the ventilator.

151.   At 8:01 pm on December 16, 2020, Mrs. Bond experienced cardio-pulmonary arrest and was pronounced dead.

152.   Dr. Robert Jones of TAMC performed an autopsy.  Dr. Jones found that Mrs. Bond died of "complications of gastric bypass surgery, including internal herniation and anastomotic leakage requiring surgical intervention and revision, aspiration, pneumonia, pulmonary embolism, hypoxic brain injury, liver failure, kidney failure requiring dialysis, intraabdominal infection and intraabdominal hemorrhage."

## FIRST CLAIM AS TO PLAINTIFF JULIE M. BOND
## <u>MEDICAL NEGLIGENCE</u>

153.   The Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 152, above, as if fully set forth herein. At all times relevant hereto, Defendant TAMC, and all health care providers operating under its authority,

owed a duty to Plaintiff Julie M. Bond to exercise that degree of care, skill, and diligence ordinarily exercised by such health care providers in the application of their skills and the performance of their profession under similar circumstances. Defendant TAMC, through health care providers operating under its authority, violated standards of care on numerous occasions, causing excruciating physical pain and suffering, intense and protracted emotional and mental anguish, and eventual death.

154.    During the November 5, 2020 surgery, Dr. Yheulon and Dr. Findlay stapled the JJ anastomosis in a retrograde fashion, thereby creating a closed loop obstruction.

155.    During the November 5, 2020 surgery, Dr. Yheulon and Dr. Findlay realized that they had stapled the JJ anastomosis backwards, that they had the opportunity to correct their surgical error, and to avoid creating an internal hernia and closed loop obstruction, but they decided not to.  This decision violated the standard of care.

156.    Immediately before the November 8, 2020 emergency surgery, CRNA Rodden violated the standard of care by incorrectly assigning Mrs. Bond an ASA rating of 2E, which is the rating for "mild systemic disease," and a patient with no functional limitations.

157. Mrs. Bond's anesthesia for her November 8, 2020 surgery was not provided by an Anesthesiologist. This violated the standard of care.

158. Prior to the November 8, 2020 surgery, CRNA Rodden violated the standard of care by failing to decompress Mrs. Bond's gastric pouch and trachea of caustic gastric secretions and foreign fluids.

159. Prior to the November 8, 2020 surgery, CRNA Rodden and/or Dr. Yhuelon violated the standard of care by failing to take steps to ensure that Mrs. Bond did not aspirate caustic gastric secretions and foreign fluids upon vomiting, to include insertion of an NG tube.

160. Mrs. Bond's aspiration of the caustic gastric secretions and foreign fluids injured the lining of the blood vessels in her lungs, causing capillary leakage and inflammation, and activation of her coagulation system ("ARDS").

161. Mrs. Bond's aspiration of the caustic gastric secretions and foreign fluids injured the alveoli in her lungs, damaging her ability to receive oxygen.

162. At the beginning of her November 8, 2020 surgery, when Mrs. Bond vomited and aspirated caustic gastric secretions and foreign fluids, CRNA Rodden violated the standard of care by failing to arrange for an immediate bronchoscopy to suction and/or lavage the caustic gastric secretions and foreign fluids.

163. The November 8, 2020 surgery lasted for over 7 hours, far beyond the pre-November 5, 2020 recommendation of Dr. Howard that "[p]ulmonary risk

reducing strategies include keeping surgery time limited to < 3 hours and avoidance of long-acting neuromuscular blockade."

164.   On November 9, 2020, TAMC physicians violated the standard of care by administering systemic tPA to Mrs. Bond rather than proceeding with the safer and gentler methods of systemic heparin and/or low dose tPA administered via catheter.

165.   As a direct and proximate result of the Defendants' negligence, as aforesaid, Mrs. Bond suffered severe and debilitating injuries and death, and is entitled to recover compensation for her great physical pain and suffering; extreme emotional distress, depression, anxiety and mental anguish; loss of enjoyment of life; loss of consortium; past and future economic loss; and loss of life.

## SECOND CLAIM AS TO PLAINTIFF JULIE M. BOND
## INFORMED CONSENT

166.   The Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 165, above, as if fully set forth herein.

167.   Mrs. Bond's physicians each failed to provide Mrs. Bond and Staff Sgt. Donald W. Bond with accurate information necessary for Mrs. Bond and/or her representative, Staff Sgt. Donald W. Bond, to give informed consent to the manner of her treatment.

168. The physicians providing medical treatment to Mrs. Bond before and during her surgeries had a duty to provide Mrs. Bond, or her representative, Donald W. Bond, with the following information:

(1)　　The condition to be treated;

(2)　　A description of the proposed treatment or procedure;

(3)　　The intended and anticipated results of the proposed treatment or procedure;

(4)　　The recognized alternative treatments or procedures, including the option of not providing these treatments or procedures;

(5)　　The recognized material risks of serious complications or mortality associated with:

　　　　(A)　　The proposed treatment or procedure;

　　　　(B)　　The recognized alternative treatments or procedures; and

　　　　(C)　　Not undergoing any treatment or procedure.

(6)　　The recognized benefits of the recognized alternative treatments or procedures.

169. Dr. Yheulon failed to advise Mrs. Bond that the consensus of the medical community was that the risks of bariatric surgery outweigh the benefits if it performed on a patient whose BMI falls below 40 and who has no comorbidities, or a patient whose BMI falls between 35 and 40 and who has a comorbidity.

170.    This was not the first time that physicians with the TAMC Bariatric Surgery Program chose to ignore Hawaii's Informed Consent law in the context of gastric bypass surgeries.  In 2015, the Honorable Alan C. Kay found and concluded that physicians at TAMC had violated Hawaii's Informed Consent law by failing to inform patient Christina Mettias that she should postpone her gastric bypass surgery in light of her nonsurgical weight loss and the drop in her BMI, given that the risks of her proposed gastric bypass surgery were now greater than its benefits.  *See* Civ. No. 1:12-cv-00527-ACK-KSC [doc. 235].

171.    On October 27, 2020, Dr. Yheulon failed to inform Mrs. Bond of TAMC's overall complication rate, which, in 2015, the Honorable Alan C. Kay found to be 20%.

172.    During the November 5, 2020 surgery, Dr. Yheulon failed to inform Mrs. Bond's representative, Staff Sgt. Bond, of the risks of failing to correct the JJ anastomosis stapled in a retrograde fashion, to include risks of internal hernia and closed loop obstruction, and emergency surgery within a short period of time.

173.    During the November 5, 2020 surgery, Dr. Yheulon failed to inform Mrs. Bond's representative, Staff Sgt. Bond, that a second, emergency surgery would include heightened risk of complications.

174.    An ordinary patient in the position of Mrs. Bond and/or Staff Sgt. Donald W. Bond, having been advised of the risks associated with a failure to correct

the JJ anastomosis stapled in a retrograde fashion, would have opted for the treatment plan of fixing the JJ anastomosis during the November 5, 2020 surgery.

175. On November 9, 2020, Mrs. Bond's physicians failed to inform Mrs. Bond's representative, Staff Sgt. Bond, that a gentler and safer method of resolving Mrs. Bond's pulmonary emboli—namely, systemic heparin and/or low dose tPA administered via catheter—could be arranged.

176. An ordinary patient in the position of Mrs. Bond and/or Staff Sgt. Donald W. Bond, having been advised of Mrs. Bond's post-surgical risk for a bleed throughout the brain, and the availability of the safer, gentler treatment option of low dose heparin and/or catheter-directed low dose tPA, would have opted for the safer and gentler treatment options.

177. As a direct and proximate result of the Defendants' negligence, as aforesaid, Mrs. Bond suffered severe and debilitating injuries and death, and is entitled to recover compensation for her great physical pain and suffering; extreme emotional distress, depression, anxiety and mental anguish; loss of enjoyment of life; loss of consortium; past and future economic loss; and loss of life.

### THIRD CLAIM AS TO PLAINTIFFS DONALD W. BOND, MINORS I.H.B., E.G.B., E.J.B, AND MOTHER, BETH ANDERSON, MENTAL ANGUISH, EMOTIONAL DISTRESS AND LOSS OF CONSORTIUM

178. The Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 177, above, as if fully set forth herein. As a direct and

proximate result of Defendants' negligence which resulted in catastrophic injuries, excruciating pain and suffering, extended emotional distress and overwhelming mental anguish and loss of life to Mrs. Bond, as aforesaid, Plaintiffs Donald W. Bond, their children I.H.B., E.G.B, and E.J.B., and mother Beth Anderson have suffered and will continue to suffer severe mental anguish, emotional distress, and loss of consortium, for which each is entitled to recover compensation.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendant United States of America for general and special damages in an amount to be proved at trial. Plaintiffs further pray that they be awarded their costs of suit and such other and further relief as the Court deems just and proper.

DATED: Honolulu, Hawaii, March 30, 2022.

/S/ LORETTA A. SHEEHAN

_____

MARK S. DAVIS
MICHAEL K. LIVINGSTON
LORETTA A. SHEEHAN
Attorneys for Plaintiffs